# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-20222

United States Court of Appeals
Fifth Circuit

**FILED**

April 27, 2015

Lyle W. Cayce
Clerk

AMERICAN HOME ASSURANCE COMPANY,

Plaintiff - Appellee Cross-Appellant

v.

OCEANEERING INTERNATIONAL, INCORPORATED,

Defendant - Appellant Cross-Appellee

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 4:12-CV-2540

Before KING, DAVIS, and OWEN, Circuit Judges.

PER CURIAM:*

Defendant-Appellant Oceaneering International, Inc., appeals the district court's grant of summary judgment in favor of Plaintiff-Appellee American Home Assurance Company. The district court's grant of summary judgment had the effect of denying insurance coverage for claims made by Oceaneering. American Home cross-appeals the district court's determination

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-20222

that Oceaneering's claim was for "property damage" within the meaning of the insurance policy.[1]  For the reasons that follow, we AFFIRM.

I.

The facts of the incident underlying this claim for insurance coverage were set out in our opinion in *Chevron USA, Inc. v. Aker Maritime, Inc.* (*Chevron I*), 604 F.3d 888 (5th Cir. 2010):

> The Genesis Spar, an oil production facility, sits 150 miles south of New Orleans in the Gulf of Mexico. A riser system attaches the floating spar to the ocean floor, 2,600 feet below.
>
> . . .
>
> Chevron hired Aker Maritime, Inc. ("Aker") in 1998 to provide design and engineering services for the initial construction of the riser system. Stability problems plagued the riser system after its completion, leading to a crack in the spar's hull in 2000. Oceaneering International, Inc. ("Oceaneering") repaired the hull at Chevron's request, and Chevron put Aker in charge of designing a permanent fix.  Large bolts called carriage bolts hold the riser system together, and Aker ordered the bolts from Lone Star, according to testimony a "well-known" bolt manufacturer that also distributed others' bolts.  Aker initially requested eight-inch Grade 5 carriage bolts, which Chevron had approved.  When Lone Star responded that it had no Grade 5 bolts, Aker placed an order for 2,092 Grade 2 carriage bolts, costing a total of $878.64.  Instead of shipping Grade 2 bolts, Lone Star shipped Grade A bolts manufactured by Oriental Fastener Co. ("Oriental").  At the time, Lone Star routinely substituted Grade A bolts for Grade 2 bolts, then a widespread practice in the fastener industry.
>
> Lone Star shipped the bolts to Oceaneering, which was in charge of assembling the risers.  The bolts were marked "OF," indicating the manufacturer, and arrived in shipping boxes bearing the Lone Star mark.  They also arrived with a packing slip

---

[1] American Home's cross-appeal to assert an alternative ground in the record for affirming the district court's judgment was unnecessary, as it is axiomatic that this court reviews judgments, not opinions. *Jennings v. Stephens*, --- U.S. ---, ---, 135 S. Ct. 793, 799 (2015) ("This Court, like all federal appellate courts, does not review lower courts' opinions, but their *judgments*.").  A cross-appeal is necessary only when the appellee attacks the judgment "with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary." *Id.* at 798 (internal quotation marks omitted).

No. 14-20222

noting that they were either "manufactured or distributed" by Lone Star. Oceaneering accepted the bolts, failing to notice the substitution.

The first bolt failure occurred on July 9, 2001, when a bolt head popped off one of the first bolts used in the risers. Jack Couch, the project manager for Oceaneering, contacted Aker's Mike Harville and told Harville that he thought the bolts were a "serious weak link." Couch took a picture of the failed bolt and sent it to Harville. Harville told Oceaneering that it had applied too much torque to the bolt, as Oceaneering was applying torque to Grade 2 bolts that it believed to be Grade 5 bolts. Oceaneering continued assembly of the riser system using the torque appropriate for Grade 2 bolts, apparently without incident. In August 2001, however, Aker took over riser assembly, and Oceaneering sent the parts, including the bolts, to Aker. Like Oceaneering's employees, Aker's employees failed to detect that the bolts were Grade A bolts.

After Aker completed installation of the riser system, Oceaneering divers inspected the construction on July 12 and 13, 2002. During the dives, live audio and video were fed to a room aboard the Genesis Spar, where Chevron representatives could see and hear everything the divers saw. As documented in Oceaneering's diving logs, the video inspection showed several bolt heads were missing. In addition, Harville testified that a Chevron employee, Bill Donahue, called him regarding a problem with bolt installation, likely on Sunday, July 14.

In the next month, Aker, Oceaneering, and Chevron representatives investigated the bolt failures. During the review, the team discovered that the bolts were Grade A, not Grade 2. It later determined that not only were the bolts the wrong kind, they were also defective due to a defective manufacturing process, including failure to stress-relieve the bolts and to heat-treat them.

Chevron sued on July 15, 2003, a year and a day after the Oceaneering dives, but less than a year after it completed its investigation. Its complaint included claims for negligence, strict liability, redhibition, products liability, and breach of contract. Aker brought claims for indemnity against Oceaneering and Lone Star. To avoid inconsistent verdicts, the parties agreed to try all the claims other than the contract claims to a jury, after which the district court would make factual findings based on the trial record and render judgment on the contract claims. The jury returned a

verdict in favor of Chevron on all claims. It found that none of Chevron's claims were prescribed. As to negligence, it found Aker, Lone Star, Oriental, and Oceaneering were all negligent and it apportioned fault under La. Civ.Code art. 2323: 40 percent to Aker, 35 percent to Lone Star, 5 percent to Oceaneering, and 20 percent to Oriental. It determined that Lone Star and Oriental were manufacturers and imposed liability in redhibition and under the LPLA. Finally, it determined that Chevron's total damages were $2,968,526.42.

*Id.* at 890–92 (footnotes omitted).[2] With respect to the contract claims relating to indemnification of Aker, the district court determined that it was bound by the jury verdict. *Id.* at 892. The district court also ordered that Lone Star pay $151,167.32, and Oriental pay $86,381.33, in attorney's fees to Chevron. *Id.*

In *Chevron I*, the Fifth Circuit affirmed the award of compensatory damages, reversed the award of attorney's fees, and remanded for further consideration of the contract claims. *Id.* at 902. Discussing the challenge to the attorney's fees award, the court determined that attorney's fees "are allowable only if Chevron has a redhibition claim under La. Civ. Code art. 2545."[3] *Id.* at 899. Although Chevron met that provision's "basic requirements for an award of attorney fees," the "hitch" was the Louisiana Products Liability Act ("LPLA"), which "'establishes the exclusive theories of liability for

---

[2] The difference between Grade A and Grade 2 bolts was also described in our prior opinion:

> Grade A and Grade 2 bolts are similar, but the standards are different in several respects. The most important difference in this case is that Grade 2 bolts require heating to a specific temperature [to] keep them from breaking, whereas Grade A certification allows the manufacturer to determine what level of heat treatment is appropriate. At the time, Oriental routinely did not heat-treat its bolts at all.

*Id.* at 891 n.2.

[3] Under Louisiana law, a redhibition claim is established where "[a] seller . . . knows that the thing he sells has a defect but omits to declare it, or [where] a seller . . . declares that the thing has a quality that he knows it does not have." La. Civ. Code art. 2545.

manufacturers for damage caused by their products,'" *id.* at 899–900 (quoting La. Rev. Stat. § 9:2800.52), and which explicitly prohibits the recovery of attorney's fees, La. Rev. Stat. § 9:2800.53(5). "Damage," as defined under LPLA, "usually does not include 'damage to the product itself [or] economic loss.'" *Chevron I*, 604 F.3d at 900 (quoting La. Rev. Stat. § 9:2800.53(5)). Therefore, the parties agreed that LPLA precluded the redhibition claim, and consequently barred attorney's fees, "unless the jury awarded damages to compensate for damage to the bolts themselves or economic loss, which are recoverable in redhibition." *Id.* (internal quotation marks and brackets omitted). The Fifth Circuit noted that under the economic loss doctrine, "[w]hen a product damages other property or causes personal injury, the action is for an unsafe product in tort," but "[i]f the damage is instead to the product itself or a loss of profits, the action properly is in warranty or contract." *Id.* Noting that LPLA incorporates that distinction, the court concluded that, "[w]hen a product damages other property, compensation is under the LPLA, not the redhibition articles." *Id.* at 901. Applying that rule to the facts of the case, the Fifth Circuit determined that "Chevron's damages incurred repairing the spar are not economic loss," as "[t]he undisputed facts . . . show that the defective products, the bolts, have damaged other property, the spar." *Id.* "That damage is not economic loss—the claim is not that the bolts were a waste of money or caused loss profits—but property loss, so Chevron's damages are entirely under the LPLA, not in redhibition." *Id.* (internal citation and quotation marks omitted).

After the remand order in *Chevron I*, Aker and Chevron reached a settlement for all claims against Aker. *Chevron USA, Inc. v. Aker Mar. Inc.* (*Chevron II*), 689 F.3d 497, 500 (5th Cir. 2012). On remand, the district court ordered that Oceaneering indemnify Aker "for nearly the full settlement amount and for attorneys' fees." *Id.* In *Chevron II*, Oceaneering appealed that

5

indemnification order.  At issue was the master service agreement (the "MSA") between Oceaneering and Chevron, which applied "to damage arising out of, connected with, incident to ~~directly or indirectly~~ or resulting from or related to [Oceaneering's] performance of this Agreement." *Id.* at 501 (internal quotation marks and footnote omitted).[4]   This court determined that Aker was indemnified by Oceaneering under the MSA, and thus affirmed the district court's judgment.   *Id.* at 502–06.   Following the *Chevron II* decision, Oceaneering paid Aker $2,049,539.27.

Oceaneering then sought indemnification from its insurer, American Home Assurance, for Oceaneering's own indemnification of Aker.  Oceaneering is the only named insured under its policy with American Home—Commercial General Liability ("CGL") Marine Package Insurance Policy No. C1854 (the "Policy").  Most relevant here, under coverage provision A(1)(a) of the Policy, American Home agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which the insurance applies."   The Policy defines "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property," as well as "[l]oss of use of tangible property that is not physically

---

[4] "Directly or indirectly" was struck out by agreement of the parties.  *Id.* at 501 n.2.

injured." The policy also contains a "sistership" exclusion[5] and an exclusion for contractual liability.[6]

On August 23, 2012, American Home filed a declaratory judgment action in the United States District Court for the Southern District of Texas, seeking a declaration that the Policy does not cover Oceaneering's payment to Aker. Oceaneering counterclaimed seeking indemnification from American Home. On January 4, 2013, Oceaneering filed a motion for partial summary judgment on its breach of contract claim, arguing that the Policy covered its payment to Aker and that none of the exclusions applied. On September 9, 2013, American Home filed a cross-motion for summary judgment.

The matter was referred to a magistrate judge, who issued a Memorandum and Recommendation on February 18, 2014, recommending that Oceaneering's motion be denied and that American Home's motion be granted. The court first addressed whether the damages at issue constituted "property damage" so as to trigger coverage under the Policy. The magistrate

---

[5] The sistership exclusion, found in coverage provision (A)(2)(n), excludes from coverage:

> Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
> (1) "Your product";
> (2) "Your work"; or
> (3) "Impaired property";
> if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

[6] The contractual liability exclusion is found in coverage provision (A)(2)(b) and excludes from coverage:

> "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:
> (1) Assured in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or
> (2) That the insured would have in the absence of the contract or agreement.

No. 14-20222

judge recognized that in *Chevron I*, the Fifth Circuit stated that the "'defective bolts have damaged other property, the spar,'" and mused that "[p]erhaps the [Fifth Circuit] was convinced that the structural integrity of the entire facility was compromised by the sub-standard bolts." The magistrate judge then recommended that American Home's motion for summary judgment should be denied as to American Home's argument that there was no "property damage" under the Policy, citing a disinclination "to controvert or disregard the Fifth Circuit's considered characterization of the damage done to the Genesis Spar in this case." The magistrate judge instead recommended that American Home's motion for summary judgment be granted on the grounds that the sistership exclusion applied to bar coverage. The magistrate judge did not reach the contractual liability exclusion. The district court adopted the Memorandum and Recommendation and issued a final judgment.

## II.

We review a district court's grant of summary judgment de novo. *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 778 F.3d 473, 475 (5th Cir. 2015). Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing a district court's grant of summary judgment, we view "all facts and evidence in the light most favorable to the non-moving party." *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (internal quotation marks omitted).

The interpretation of an insurance contract is also reviewed de novo. *Potomac Ins. Co. of Ill. v. Jayhawk Med. Acceptance Corp.*, 198 F.3d 548, 550 (5th Cir. 2000). Terms of an insurance policy that "are subject to more than one reasonable construction are interpreted in favor of coverage." *Gilbert Texas Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 133 (Tex. 2010). "But an ambiguity does not exist simply because the parties

interpret a policy differently." *Id.* "[W]here the language is plain and unambiguous, courts must enforce the contract as made by the parties, and cannot make a new contract for them, nor change that which they have made under the guise of construction." *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 753 (Tex. 2006) (internal quotation marks omitted).

### III.

Though the district court granted summary judgment based on the sistership exclusion, we do not reach that issue, as we conclude that Oceaneering failed to carry its burden of establishing "property damage" as required by the Policy. We may affirm a district court's judgment on any basis supported in the record. *Teague v. Quarterman*, 482 F.3d 769, 773 (5th Cir. 2007). Oceaneering bears the burden of establishing American Home's duty to indemnify. *Nat'l Union Fire Ins. Co. v. Puget Plastics Corp.*, 532 F.3d 398, 401 (5th Cir. 2008) ("In Texas, the insured carries the burden to establish the insurer's duty to indemnify by presenting facts sufficient to demonstrate coverage."). Here, American Home's liability to indemnify Oceaneering only comes into play if Oceaneering is liable for "property damage," defined under the Policy as "[p]hysical injury to tangible property." Oceaneering asserts that there was "property damage" within the meaning of the Policy, as the defective bolts damaged the Genesis Spar.

Oceaneering argues that we are bound by the law of the case doctrine to follow this court's decisions in *Chevron I* and *Chevron II*, both of which, Oceaneering contends, found that the defective bolts caused property damage to the spar. This court's decision in *Chevron I* stated:

> Chevron's damages incurred repairing the spar are not economic loss. The undisputed facts here show that the defective products, the bolts, have damaged other property, the spar. That damage is not economic loss—the claim is not that the bolts were "a waste of

9

money" or caused lost profits—but property loss, so Chevron's damages are entirely under the LPLA, not in redhibition.

*Chevron I*, 604 F.3d at 901 (citation omitted). According to Oceaneering, the *Chevron I* opinion's statement that the bolts "damaged other property, the spar," binds us to determine that there was "property damage" to the spar within the meaning of the Policy. Oceaneering is mistaken for two reasons, one technical, the other fundamental. The technical flaw in Oceaneering's argument is that the law of the case doctrine only applies to "subsequent stages of the same case." *United States v. Mendez*, 102 F.3d 126, 131 (5th Cir. 1996) (internal citation and quotation marks omitted); *see also United States v. Lawrence*, 179 F.3d 343, 351 (5th Cir. 1999) ("Although Lawrence was tried jointly with Tolliver, the doctrine of the law of the case does not govern his claim. Tolliver's § 2255 motion is not the same 'case' as Lawrence's § 2255 motion."). Even "an identical issue decided in a separate action does not qualify as law of the case." *Farina v. Nokia Inc.*, 625 F.3d 97, 117 n.21 (3d Cir. 2010). This is a separate action from the suit in *Chevron I*, not a subsequent stage of the same action. As such, *Chevron I* is simply not the law of the case. *See* 18B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 4478 (2d ed. 2014) ("Law-of-the-case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit. They do not apply between separate actions." (footnote omitted)). The fundamental flaw in Oceaneering's argument is that it assigns talismanic significance to the use of the words "property damage" in the *Chevron I* opinion. Yet the words an opinion uses cannot be abstracted from the questions and arguments presented to the court for decision. Before the *Chevron I* court, the question was whether Chevron could recover attorney's fees in its underlying lawsuit. Answering that question required characterizing Chevron's claim as a claim in redhibition, for

which attorney's fees are recoverable, or as a claim under LPLA, for which they are not. A claim in redhibition seeks only economic losses; any products liability claim for damages other than economic losses falls under LPLA. *See Chevron I*, 604 F.3d at 900. The appellant in *Chevron I* argued in its brief that Chevron sought only the costs of removing and replacing the bolts in the Genesis Spar, not the costs of the bolts themselves or any lost opportunities or profits resulting from the bolts being defective. Brief for Appellant T-3 Custom Coating at 43–46, *Chevron I*, 604 F.3d 888 (No. 07-31117), 2008 WL 7662650, at \*43–\*46. According to the appellant in *Chevron I*, economic loss under Louisiana law is only the cost of the defective product and any lost profits or opportunities—in contrast, it argued that the cost of removing and replacing the defective product is non-economic loss recoverable only under LPLA. *Id.*; *see also* Reply Brief for Appellant T-3 Custom Coating at 22–24, *Chevron I*, 604 F.3d 888 (No. 07-31117), 2008 WL 7662655, at \*22–\*24. Chevron responded by arguing that economic loss under Louisiana law encompasses the costs of removing and replacing the defective product and therefore that its claim was in redhibition, not under LPLA. Brief for Appellee Chevron USA, Inc. in Opposition to Brief of Appellant T-3 Custom Coating at 40–43, *Chevron I*, 604 F.3d 888 (No. 07-31117), 2008 WL 8017258, at \*40–\*43. That was the only argument made by the parties that the Genesis Spar suffered "property damage" as the result of the defective bolts. "Property damage" was, therefore, used in the *Chevron I* opinion as a term of art, separating "damage" compensable under LPLA—the costs of removing and replacing the defective bolts—from damages that would sound in redhibition—the costs of the original bolts plus any lost opportunities or profits. *See* La. Rev. Stat. § 9:2800.54(A) ("The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably

anticipated use of the product by the claimant or another person or entity."); La. Rev. Stat. § 9:2800.53(5) (defining "Damage" as "all damage caused by a product, including survival and wrongful death damages, for which Civil Code Articles 2315, 2315.1 and 2315.2 allow recovery. 'Damage' includes damage to the product itself and economic loss arising from a deficiency in or loss of use of the product only to the extent that Chapter 9 of Title VII of Book III of the Civil Code, entitled 'Redhibition,' does not allow recovery for such damage or economic loss. Attorneys' fees are not recoverable under this Chapter."). Neither party argued that the incorporation of the defective bolts into the Genesis Spar—and, consequently, the need to remove and replace them—was not "damage" under LPLA. This court's statement in *Chevron I* that the bolts "damaged other property, the spar" was therefore meant only to classify the claim for the costs of removing and replacing the defective bolts as being a claim not for purely economic losses, i.e. a claim in redhibition, but rather for other property damage, i.e. a claim under LPLA. As such, the *Chevron I* opinion says nothing about whether the claims satisfy the definition of property damage—"physical injury to tangible property"—in the CGL Policy at issue here.

*Chevron II* is even further afield. *Chevron II* concerned Aker's attempt to have Oceaneering indemnify it for the judgment Chevron obtained against Aker. *Chevron II*, 689 F.3d at 500. Oceaneering's indemnity obligation arose from a provision in the MSA between Chevron and Oceaneering:

> CONTRACTOR [Oceaneering] shall be liable to and hold INDEMNITEES harmless for any loss of or damage to the property of COMPANY [Chevron] (its joint venturers and partners and affiliates) arising out of, connected with, incident to ~~directly or indirectly~~ or resulting from or related to CONTRACTOR'S performance of this Agreement, including but not limited to, CONTRACTOR'S use of equipment provided by COMPANY (its joint venturers and partners and affiliates) or others, regardless of

the passive, concurrent or active negligence of, and regardless of whether liability without fault (including, but not limited to, claims for unseaworthiness of any vessel) is imposed or sought to be imposed on, INDEMNITEES.

*Id.* at 501 (footnote omitted). Pointing to the "damage to the property of COMPANY [Chevron]" language in the MSA, Oceaneering argues that a necessary predicate finding underlying this court's holding that Oceaneering was obligated to indemnify Aker is that the defective bolts caused property damage to the Genesis Spar. Yet, again, Oceaneering's argument fails, as the opinion never addresses whether the bolts caused property damage to the spar. *See generally Chevron II*, 689 F.3d 497. The *Chevron II* opinion appears not to have addressed the issue for good reason—the issue was never raised by Oceaneering in its brief. *See generally* Brief for Appellant Oceaneering Int'l, Inc., *Chevron II*, 689 F.3d 497 (No. 11-30369), 2011 WL 9525615. As such, the *Chevron II* opinion did not pass any judgment on the issue of whether the bolts had caused property damage to the spar. The question was not before the court, as it had not been raised. *See McKay v. Novartis Pharm. Corp.*, 751 F.3d 694, n.6 (5th Cir. 2014) ("An appellant abandons all issues not raised and argued in its initial brief of appeal and we have held repeatedly that we will not consider issues not briefed by the parties." (internal quotation marks, citation, and brackets omitted)).

Oceaneering rests its argument that there was "property damage" within the meaning of the CGL Policy on these two prior opinions.[7] Because these

---

[7] Oceaneering states, in a footnote in its brief, that "[o]ther States and Circuits recognize that when a defective product is incorporated into a larger product, the resulting harm is considered to be covered property damage." We are reluctant to pass on such a potentially far-reaching argument where it was only joined on the merits by Oceaneering in such a limited manner. As such, we note only that the cases cited by Oceaneering in support of that assertion are inapposite. Three of the cases interpreted prior versions of the CGL policy, which has since been amended to define "property damage" as "*physical* injury to tangible property," and have been distinguished by subsequent opinions on that basis.

No. 14-20222

two opinions fail to establish that the bolts caused "property damage" within the meaning of the Policy, Oceaneering has failed to carry its burden of showing that its claim falls within the scope of the Policy. As such, we do not reach the applicability of the sister-ship exclusion or the insured contract exclusion. *See Teague*, 482 F.3d at 773.

IV.

The judgment of the district court is AFFIRMED.

---

*Compare Goodyear Rubber & Supply Co. v. Great Am. Ins. Co.*, 471 F.2d 1343, 1344 (9th Cir. 1973) ("Under well-settled principles, when one product is integrated into a larger entity and the product proves defective, the damage is considered as damage to the entity to the extent that the market value of the entity is reduced by an amount in excess of the value of the defective product."), *with N.H. Ins. Co. v. Vieira*, 930 F.2d 696, 701 (9th Cir. 1991) ("In light of the new, narrowed definitions of property damage, we are persuaded that diminution in value is not 'physical damage' to 'tangible property,' and hence is not covered by New Hampshire's policy."); *compare Hauenstein v. St. Paul-Mercury Indemnity Co.*, 65 N.W.2d 122, 125–26 (Minn. 1954), *with Federated Mut. Ins. Co. v. Concrete Units, Inc.*, 363 N.W.2d 751, 755–56 (Minn. 1985); *compare Geddes & Smith, Inc. v. St. Paul-Mercury Indemnity Co.*, 334 P.2d 881, 885 (Cal. 1959), *with Vieira*, 930 F.2d at 697–701, *and F&H Constr. v. ITT Hartford Ins. Co.*, 12 Cal. Rptr. 3d 896, 903 (Cal. Ct. App. 2004) ("Prior to 1973, the standard CGLI policies defined 'property damage' as 'injury to or destruction of tangible property.' . . . Beginning in 1973, the definition of 'property damage' in the standard CGLI policy was changed to '*physical* injury to or destruction of tangible property.' Giving this new definition its plain and ordinary meaning, the majority of courts hold that it does not cover economic damages."). Another of the cases cited by Oceaneering, *Sturges Manufacturing Co. v. Utica Mutual Insurance Co.*, 332 N.E.2d 319 (N.Y. 1975), also construed the earlier version of the CGL policy, which defined property damage merely as "injury to or destruction of tangible property." *See id.* at 321. The final case cited by Oceaneering is wholly uninstructive on the issue in question here. *See Pittsburgh Bridge & Iron Works v. Liberty Mut. Fire Ins. Co.*, 444 F.2d 1286, 1288 (3d Cir. 1971) (noting that the CGL policy provides coverage "[w]here X supplies a part to Y who constructs an entity from X's part and from other parts and X's part proves defective causing damage to the entity" but failing to define "damage to the entity"). Further, the Texas Supreme Court has expressed skepticism that the mere incorporation of a defective product into a larger product—without something more—constitutes property damage, stating in dicta that "faulty workmanship that merely diminishes the value of the home without causing physical injury or loss of use does not involve 'property damage.'" *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 10 (Tex. 2007); *see also Bldg. Specialties, Inc. v. Liberty Mut. Ins. Co.*, 712 F. Supp. 2d 628, 645 (S.D. Tex. 2010) ("There were no allegations of any resulting physical damage to the duct work itself or to other parts of the house or to the loss of use. The petition sought damages only for the cost of repairing the defective duct work. The petition alleged defective work by the insured but did not allege that the defective work 'caused physical injury or loss of use.' The petition did not allege covered 'property damage.'").

14