# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
July 31, 2012

Lyle W. Cayce
Clerk

No. 11-30369

CHEVRON USA, INCORPORATED,

Plaintiff

v.

AKER MARITIME INCORPORATED; TECHNIP OFFSHORE ENGINEERING, INCORPORATED; TECHNIP OFFSHORE MOORINGS, INCORPORATED; TECHNIP OFFSHORE INCORPORATED,

Defendants-Appellees

v.

OCEANEERING INTERNATIONAL INCORPORATED,

Defendant-Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana

Before JONES, Chief Judge, PRADO, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

Following a jury trial, Chevron USA, Inc. was awarded damages from Aker Maritime, Inc. and its subsidiaries, and from Oceaneering International, Inc. That judgment was affirmed in an earlier appeal and is not subject to further challenge. A bench trial was held on remand to consider remaining contractual claims. The district court ordered Oceaneering to pay indemnity

No. 11-30369

and attorneys' fees to Aker. In this appeal, Oceaneering seeks to reverse those awards. We AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2001, there was a significant and costly failure of insignificant-sized and inexpensive bolts used on an oil production and drilling facility that sits in 2600 feet of water, 150 miles south of New Orleans in the Gulf of Mexico. All the bolts in the riser system securing the Genesis Spar facility to the Gulf's floor had to be replaced when defects in them were found. Chevron, the operator and part owner of the facility, brought suit to allocate responsibility among several companies involved in the procurement and installation of the bolts.

This is the second appeal of a final judgment in the district court. We excerpt from our earlier opinion those facts that are most important for understanding the remaining issues:

> Chevron hired Aker Maritime, Inc. ("Aker") in 1998 to provide design and engineering services for the initial construction of the riser system. Stability problems plagued the riser system after its completion, leading to a crack in the spar's hull in 2000. Oceaneering International, Inc. ("Oceaneering") repaired the hull at Chevron's request, and Chevron put Aker in charge of designing a permanent fix. Large bolts called carriage bolts hold the riser system together, and Aker ordered the bolts from Lone Star, according to testimony a "well-known" bolt manufacturer that also distributed others' bolts. Aker initially requested eight-inch Grade 5 carriage bolts, which Chevron had approved. When Lone Star responded that it had no Grade 5 bolts, Aker placed an order for 2,092 Grade 2 carriage bolts, costing a total of $878.64. Instead of shipping Grade 2 bolts, Lone Star shipped Grade A bolts[1] manufactured by Oriental Fastener Co. ("Oriental"). At the time,

---

[1] Grade A and Grade 2 bolts are similar, but the standards are different in several respects. The most important difference in this case is that Grade 2 bolts require heating to a specific temperature [to] keep them from breaking, whereas Grade A certification allows the manufacturer to determine what level of heat treatment is appropriate. At the time, Oriental routinely did not heat-treat its bolts at all. [Footnote in original.]

2

No. 11-30369

Lone Star routinely substituted Grade A bolts for Grade 2 bolts, then a widespread practice in the fastener industry.

Lone Star shipped the bolts to Oceaneering, which was in charge of assembling the risers. The bolts were marked "OF," indicating the manufacturer, and arrived in shipping boxes bearing the Lone Star mark. They also arrived with a packing slip noting that they were either "manufactured or distributed" by Lone Star. Oceaneering accepted the bolts, failing to notice the substitution.

The first bolt failure occurred on July 9, 2001, when a bolt head popped off one of the first bolts used in the risers. Jack Couch, the project manager for Oceaneering, contacted Aker's Mike Harville and told Harville that he thought the bolts were a "serious weak link." Couch took a picture of the failed bolt and sent it to Harville. Harville told Oceaneering that it had applied too much torque to the bolt, as Oceaneering was applying torque to Grade 2 bolts that it believed to be Grade 5 bolts. Oceaneering continued assembly of the riser system using the torque appropriate for Grade 2 bolts, apparently without incident. In August 2001, however, Aker took over riser assembly, and Oceaneering sent the parts, including the bolts, to Aker. Like Oceaneering's employees, Aker's employees failed to detect that the bolts were Grade A bolts.

*Chevron USA, Inc. v. Aker Mar., Inc.*, 604 F.3d 888, 890-91 (5th Cir. 2010) (two footnotes omitted).

After the riser system was installed, it was discovered during a July 2002 underwater inspection that the heads of several bolts had broken off. Further investigation resulted in a decision to replace all the bolts.

In July 2003, Chevron sued Aker, Oceaneering, and other companies no longer in the suit. After a jury trial, Chevron's total damages were found to be almost $3 million. All defendants were found to be negligent, and fault was apportioned among them. Aker was held to be 35% at fault, the company Aker contacted to supply the bolts also 35%, and the manufacturer of the bolts 20%. Oceaneering and the Aker subsidiary that assembled the risers after taking over from Oceaneering were each found to be 5% at fault. The district court

No. 11-30369

dismissed Aker's indemnity claim against Oceaneering, concluding it was "trumped" by the jury verdict.

On appeal, we affirmed the damages award. We also vacated the award of attorneys' fees, and reversed and remanded the dismissal of Aker's indemnity claims. After our remand order, Aker and Chevron reached a settlement for all claims against Aker "irrespective of their nature." On remand, the court found Oceaneering liable to indemnify Aker for nearly the full settlement amount and for attorneys' fees.

There are two contracts that control the issues raised on appeal. One is a Contract for Genesis Riser Systems Support Services, entered by Chevron and Aker in December 1998, which we will call the "Support Contract." The contract specifically dealt with the Genesis Spar project. The other is the Master Service Order and Agreement, entered between Chevron and Oceaneering in June 1991, which we will call the "Master Agreement." It is a general agreement that predates the Genesis Spar project.

## DISCUSSION

On this appeal, Oceaneering argues that neither indemnity nor attorneys' fees are appropriate because the relevant contracts do not support the awards. We will discuss the indemnity issues first.

*I.    Indemnity*

Whether Aker is entitled to indemnity turns on questions of contract interpretation. Those questions are legal ones to be reviewed *de novo. E.g.*, *Wal-Mart Stores, Inc. v. Qore, Inc.*, 647 F.3d 237, 242 (5th Cir. 2011). The contract and record are reviewed "under the same standards that guided the district court." *Id.* In this diversity suit, we apply the contract interpretation rules of

4

No. 11-30369

the relevant state, which is Louisiana. *See Citigroup Inc. v. Fed. Ins. Co.*, 649 F.3d 367, 371 (5th Cir. 2011). In Louisiana, words and phrases in a contract are construed using generally prevailing meaning. La. Civ. Code art. 2047; *Cadwallader v. Allstate Ins. Co.*, 848 So. 2d 577, 580 (La. 2003).

The relevant indemnity clause is found in Master Agreement Paragraph 6(b), which was executed by Chevron and Oceaneering:

> CONTRACTOR [Oceaneering] shall be liable to and hold INDEMNITEES harmless for any loss of or damage to the property of COMPANY [Chevron] (its joint venturers and partners and affiliates) arising out of, connected with, incident to ~~directly or indirectly~~[2] or resulting from or related to CONTRACTOR'S performance of this Agreement, including but not limited to, CONTRACTOR'S use of equipment provided by COMPANY (its joint venturers and partners and affiliates) or others, regardless of the passive, concurrent or active negligence of, and regardless of whether liability without fault (including, but not limited to, claims for unseaworthiness of any vessel) is imposed or sought to be imposed on, INDEMNITEES.

As previously mentioned, this contract predates Oceaneering's involvement on the Genesis Spar. As a master agreement, it appears intended to apply to a variety of projects on which Chevron may at different times engage Oceaneering. By its own terms, the indemnity applies to damage "arising out of, connected with, incident to or resulting from or related to [Oceaneering's] performance of this Agreement." The work Oceaneering was to perform was described as "underwater services including diving, remote operated vehicles (ROVs), survey and related services."

The Master Agreement defines "Indemnitees," its importance suggested by the fact it is the first term in the agreement.

> CHEVRON U.S.A., INC. and all of its affiliated or parent or subsidiary companies or corporations, all of its co-owners or joint

---

[2] The three words with a strike-through were eliminated by agreement.

5

venturers, and all of the aforesaid entities' agents, officers, employees, representatives or insurers.

We will later quote the language in the Support Contract that makes Aker the agent of Chevron for certain purposes.

Oceaneering insists that this claim falls outside the scope of the indemnity clause. Even if Aker were an agent, which it disputes, Oceaneering's basic point is that Aker's acts as an agent are not related in any way to Oceaneering's performance of the agreement. Oceaneering also argues that the Master Agreement limits the amount of indemnity, that the Chevron-Aker Support Contract limits Aker's ability to recover from Oceaneering, and that Aker was not a third-party beneficiary of the Master Agreement.

The task at hand is contract interpretation. When construing indemnification contracts, we will not ignore broad, straightforward language that unequivocally states an agreement to indemnify. *Perkins v. Rubicon, Inc.*, 563 So. 2d 258, 259 (La. 1990). This contract unambiguously indemnifies agents of Chevron, using extremely broad language and going so far as to indemnify them regardless of their own negligence.[3] Independent contractors, on the other hand, are not listed in this "indemnitees" definition. Thus, whether Aker was an agent is crucial to determining Oceaneering's indemnification obligation.

*A.    Was Aker an Agent of Chevron?*

An agency relationship is determined by looking to "the facts surrounding the two parties." *Smason v. Celtic Life Ins. Co.*, 615 So. 2d 1079, 1085 (La. Ct. App. 1993). The subjective belief of third parties does not determine the existence of an agency relationship. *Id.* "Under Louisiana law, an agency

---

[3] In 2010, the Louisiana legislature passed a bill that will void, as against public policy, some indemnity clauses that seek to shift liability for an indemnitee's negligence, but this only applies to contracts entered into after January 1, 2011. La. Rev. Stat. § 9:2780.1(F).

relationship cannot be presumed, it must be clearly established." *Matter of Oxford Mgmt., Inc.*, 4 F.3d 1329, 1336 (5th Cir. 1993).

An agency may be created by written agreement. *Busby v. Walker*, 84 So. 2d 304, 307 (La. Ct. App. 1995). This agency is defined in Support Contract Paragraph 1:

> (c) CONTRACTOR [Aker] agrees to perform all SERVICES hereunder as an independent CONTRACTOR having full control of the manner and means of the performance of SERVICES, and not as an employee of COMPANY [Chevron]. . . .
>
> (d) Notwithstanding paragraph (c) of this article 1, CONTRACTOR [Aker] may procure equipment, materials, and SERVICES for COMPANY [Chevron] as Agent for COMPANY. When CONTRACTOR provides such SERVICES as Agent for COMPANY, the following provisions of this Article 1 shall govern:
>
>> (i) All purchases of materials, equipment and SERVICES including the applicable purchase order and/or contract terms therefor shall be subject to COMPANY approval. COMPANY will be responsible for providing to CONTRACTOR full information as to COMPANY's requirements for the procurement SERVICES to be performed hereunder. In performing such procurement SERVICES, CONTRACTOR will endeavor to obtain reasonable guarantees and warranties favorable to COMPANY from service contractors and from the manufacturers of all plant, equipment and other manufactured items to be procured hereunder for COMPANY, and CONTRACTOR will cooperate with COMPANY in its enforcement of such warranties and guarantees obtained.
>
>> (ii) CONTRACTOR's liability to COMPANY as a result of any claims that result from or are in any way connected with the acts or omissions of any service CONTRACTOR or manufacturer pursuant to any contract entered into by CONTRACTOR as Agent for COMPANY shall be limited solely to COMPANY'S recoveries from such service CONTRACTOR or manufacturer.

No. 11-30369

This language establishes that Aker was Chevron's agent in its capacity as a procurer of "equipment, materials, and services" for Chevron. Oceaneering maintains Paragraph 1(c) controls, arguing the exception in Paragraph 1(d) does not apply because damages were not caused by Aker acting as an agent to procure materials. Instead, damages were caused by Aker's actions as an independent contractor. We examine next the scope of the agency.

B.    *What was the Scope of the Agency?*

Contracts are construed using their ordinary and prevailing meaning. *See* La. Civ. Code art. 2047. The Support Contract explicitly creates an agency relationship when Aker is "procur[ing] equipment, materials, and services" for Chevron. Oceaneering maintains this language means Aker is only an agent when dealing with the supplier. Aker was thus not Chevron's agent with respect to Oceaneering because Aker never "procured" anything *from* Oceaneering.

"Procurement" means an "act of getting or obtaining something." *Black's Law Dictionary* 1327 (9th ed. 2009). The plain language of the term extends beyond Aker's mere ordering and includes the receipt of the bolts. Receipt and acceptance of faulty and improper bolts is at the heart of this action. The agency began with Aker's initial ordering of the bolts and continued through the obtaining of possession. Because Chevron required the bolts to be delivered directly to Oceaneering, procurement continued at least until that delivery.

The agency provision also refers to purchase orders and contracts between Aker and a supplier. There were no such written agreements between Aker and the distributer. We disagree with Oceaneering that the Support Contract requires purchase orders or contracts as prerequisites to establishing an agency relationship. When such documentation exists, though, the Support Contract makes their terms subject to Chevron's approval.

Oceaneering further contends that, at a minimum, it should not be obligated to indemnify Aker for the full amount of its liability because Aker's role

8

as agent-procurer was only partially the source of its 35% liability to Chevron. Oceaneering maintains that Chevron made claims against Aker for failures in quality control, inspection, and engineering services, and it was in this capacity that Aker settled its claims with Chevron. Therefore, Oceaneering maintains the district court erred in holding it liable for all of Aker's 35% liability.

The contention that Aker's responsibility should be divided in this way is being raised for the first time on appeal. Arguments not raised in district court will not be considered absent "extraordinary circumstances." *N. Alamo Water Supply Corp. v. City of San Juan, Tex.*, 90 F.3d 910, 916 (5th Cir. 1996). "Extraordinary circumstances exist when the issue involved is a pure question of law and a miscarriage of justice would result from our failure to consider it." *Id.* This litigation began over eight years ago. It has gone through two appeals, multiple proceedings in district court, and a settlement between Aker and Chevron. The jury found Aker liable for general negligence. Oceaneering did not propose instructions or a verdict form allowing the verdict to divide Aker's fault into subcategories. It did not request a new trial, raise these issues in the district court on remand, or challenge Aker's settlement with Chevron.

In fact, the parties in the district court addressed a different subdividing of liability. Jurors assigned an additional 5% liability to an Aker subsidiary that had assembled the risers after Oceaneering stopped doing so. The district court deducted the amount attributed to Aker's subsidiary from the total settlement. Oceaneering did not argue that any further partial reduction was justified.

These arguments are waived.

In summary, then, Aker's arranging for the purchase and delivery of the bolts to Oceaneering was in the capacity of Chevron's agent under the Support Contract. Some of the bolts were then used by Oceaneering in the initial efforts to assemble part of the riser system. The district court considered that work to be part of Oceaneering's performance under the Master Agreement:

As Chevron's receiving contractor, Oceaneering failed to detect that Lone Star [the distributor of the bolts] made an unauthorized substitution, which gave rise to Chevron's claims against Aker. Hence, this scenario falls within the language of the indemnity clause, making Oceaneering liable to Aker.

The court noted that this indemnity is quite broad, making Oceaneering's relatively minor and brief performance of work under its Master Agreement with Chevron the source of a duty to indemnify Aker, who as Chevron's agent was found by jurors to be much more at fault than Oceaneering. Such inequities, often unpredictable when contracts are written, do not then become a basis to prevent the contracts from being enforced.

*C.    Limitations on liability*

Oceaneering further maintains that even if Aker is entitled to indemnity, the Master Agreement limits its indemnity obligation to the applicable insurance coverage. In the district court there was no determination as to what insurance was applicable nor was Oceaneering's insurer a party. As such, Oceaneering contends judgment against it was in error. But, again, Oceaneering failed to raise these contentions at any point prior to this appeal and they are waived.

*D.    Other arguments*

Oceaneering raises other arguments. One is that the Support Contract's Paragraph 1(d) prohibits Aker from seeking indemnity. It maintains that only Chevron can pursue an indemnity action against it arising out of Aker's role as agent. Oceaneering bases this argument on Support Contract Paragraph 1(d) subsections (i) and (ii). Paragraph 1(d)(i) states that Aker will obtain reasonable warranties and "will cooperate with [Chevron] in its enforcement of such guarantees or warranties obtained." Chevron initiated this litigation and Aker cross-claimed. Support Contract Paragraph 1(d)(i) does not prohibit Aker from cross-claiming in litigation Chevron commences.

Subsection 1(d)(ii) does not offer any additional support. It limits Aker's liability to Chevron's recovery against the manufacturer. Oceaneering argues that the Support Contract's limitation of Aker's liability to Chevron demonstrates that Aker was not granted the right to sue a manufacturer it deals with as an agent. Although Subsection 1(d)(ii) may make bringing a suit unnecessary, it does not demonstrate that Aker is prohibited from pursuing a suit for indemnification against Oceaneering.

Oceaneering is not a third-party beneficiary of the Support Contract. A contracting party may stipulate a benefit to a third person, but the intent of the parties to stipulate such a benefit must be clear. La. Civ. Code art. 1978; *Doucet v. Nat'l Maint. Corp.*, 822 So. 2d 60, 66 (La. Ct. App. 2002). No clear intent exists and, thus, Oceaneering cannot rely on the Support Contract's terms.

Oceaneering argues that neither is Aker a third-party beneficiary of the Master Agreement. Unlike the Support Contract, the Master Agreement manifests a clear intention to indemnify agents of Chevron. The fact that Aker was not named as an agent is irrelevant. Oceaneering agreed to indemnify *all* agents of Chevron. Who those agents would be in the future under different projects would not be known at the time of the 1991 Master Agreement.

## II.    *Attorneys' fees*

Oceaneering argues the award relied on an incorrect version of the contract, the court failed to consider certain required factors under our caselaw, and the fees should have been segregated.

Our court reviews an attorneys'-fees award for an abuse of discretion. *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 227 (5th Cir. 2008). To constitute an abuse of discretion, the district court must have erroneously applied the law or made a clearly erroneous assessment of the evidence. *Id.* "A fee award is governed by the same law that serves as the rule

of decision for substantive issues in the case." *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).  That means Louisiana law applies.

Oceaneering contends the district court abused its discretion by relying on the wrong version of the Master Agreement when determining attorneys' fees, failing to analyze the *Johnson* factors, and failing to segregate Aker's fees.

Regarding the contention that the court applied the wrong version of the Master Agreement, Oceaneering specifically maintains that the court relied on the "directly or indirectly" language in Master Agreement Paragraph 6(b) that was struck from the contract.  But, as Aker points out, the court relied upon "directly or indirectly" as it is employed in Master Agreement Paragraph 6(c), not 6(b).  This provision was not struck from the contract.  Thus, the court did not rely on an incorrect version of the contract.

The contention that the court did not analyze the *Johnson* factors similarly fails.  In Louisiana, the amount of an attorneys'-fees award is governed by Rule 1.5 of the Rules of Professional Conduct.  *State Dep't of Transp. & Dev. v. Williamson*, 597 So. 2d 439, 442 n.9 (La. 1992).  The factors therein are very similar to those used in the federal "lodestar" method as set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989).  The *Johnson* factors include the difficulty of the matter, the requisite skill to perform the legal service, the amount involved, the results obtained, and the ability of the attorneys.  *Id.* at 717-19.  In its opinion, the court stated:  "In conclusion, the complexity of this matter, counsel's expertise, the amount of money involved, and the results obtained all require this Court to award Aker the full amount of attorneys' fees and costs claimed, without any downward adjustment." *Chevron USA, Inc. v. Aker Mar., Inc.*, No. 2:03-CV-2027, 2011 WL 999253, at *4 (E.D. La. Mar. 17, 2011).  Other statements in the same analysis show the court also considered the time and labor required as well as the customary fee.  *Id.* at *3-4.

No. 11-30369

Because the court applied factors essentially identical to those required by Louisiana law, it did not abuse its discretion.

Finally, Oceaneering contends that the district court erred in failing to segregate Aker's fees. The relevant provision of the Master Agreement reads:

> CONTRACTOR shall promptly pay (I) to any INDEMNITEE all costs and attorneys' fees incurred by such INDEMNITEE resulting directly or indirectly from any and all loss, damage, injury, liability and claims for which CONTRACTOR is obligated to indemnify such INDEMNITEE pursuant to the Paragraph 6 . . . .

This shows that "directly or indirectly" was not struck from Master Agreement Paragraph 6(c). This clause is broad. It does not require segregation because the entire litigation is at least indirectly related to Oceaneering's actions that resulted in the obligation to indemnify Aker.

AFFIRMED.