# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
June 15, 2023

Lyle W. Cayce
Clerk

No. 22-30799

Louisiana State, *by and through Louisiana Department of Wildlife and Fisheries*,

*Plaintiff—Appellant*,

*versus*

National Oceanic & Atmospheric Administration, Richard Spinrad, Administrator; Chris Oliver, *in his official capacity as Assistant Administrator for Fisheries*; Samuel D. Rauch, III, *in his official capacity as Deputy Assistant Administrator for Regulatory Programs*; National Marine Fisheries Service; Department of Commerce, Gina Raimondo, Secretary,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:21-CV-1523

Before Smith, Clement, and Wilson, *Circuit Judges*.
Cory T. Wilson, *Circuit Judge*:

Before us is the narrow question of whether the district court erred in holding that, based on the summary judgment record, the State of Louisiana failed to establish standing to challenge a National Marine Fisheries Service

(NMFS) rule that requires certain shrimping vessels in Louisiana waters to use turtle excluder devices (TEDs). We affirm.

## I.

## A.

There have long been TED requirements for shrimping. In 1987, NMFS promulgated a rule requiring shrimp trawlers 25 feet or longer operating in offshore waters from North Carolina to Texas to install TEDs, subject to a few preconditions. *See* 52 Fed. Reg. 24,244 (June 29, 1987). Our circuit upheld that rule over Louisiana's challenge. *See State of La., ex rel. Guste v. Verity*, 853 F.2d 322, 324 (5th Cir. 1988). But the 1987 rule exempted skimmer trawlers and inshore shrimpers from its requirements, so long as the exempted vessels followed tow-time restrictions. 50 C.F.R. § 223.206(d)(2)(ii)(A)(3).

In 2012, NMFS proposed a more restrictive rule requiring TEDs for skimmer trawlers, 77 Fed. Reg. 27,411 (May 10, 2012), but withdrew it in 2013, 78 Fed. Reg. 9,024 (Feb. 7, 2013). In 2016, the agency proposed another rule, again largely requiring all skimmer trawlers to use TEDs regardless of length or whether they operated inshore. 81 Fed. Reg. 91,097 (Dec. 16, 2016). NMFS justified this newest iteration in part based on a conclusion that tow-time restrictions were "inherently difficult to enforce."

NMFS promulgated a tailored version of its proposed 2016 rule in December 2019 (the Final Rule). The Final Rule required TEDs on all skimmer trawlers over 40 feet, including those that operate inshore. *See* 84 Fed. Reg. 70,048 (Dec. 20, 2019). The Final Rule's environmental impact statement (EIS) estimates that:

> For the 1,047 vessels in the Gulf of Mexico that are expected to be affected by this regulatory action, the aggregate loss in gross revenue from shrimp loss is about $2.29 million, which represents about 2.9% of their gross revenue. Including the costs of purchasing TEDs, which are about $1.36 million, the

total adverse effect in the first year is about $3.65 million, which represents about 4.6% of their gross revenue in the aggregate.

The EIS projects that 178 vessels will shut down throughout the Gulf of Mexico as a result of these costs. Further, the EIS predicts a shrimp loss per vessel of 6.21%, with a total adverse effect of $3,482 per vessel in the first year in the Gulf of Mexico. These losses would be less in subsequent years, once TEDs are initially purchased and installed. Cumulatively, the EIS forecasts that the "expected annual loss in food shrimp landings is approximately 870,000 lbs under this regulatory action," approximately 0.3% of all food shrimp processed in the Gulf.

According to NMFS, changes incorporated in the Final Rule compared to the proposed 2016 version reduced the number of vessels impacted by more than 80% and the total economic effect by 73%. Neither NMFS nor Louisiana has offered data specific to Louisiana's shrimping industry.

**B.**

The Final Rule was to go into effect on April 1, 2021, but on March 31, 2021, NMFS delayed the effective date to August 1, 2021, citing the COVID-19 pandemic as justification for the delay. On August 11, 2021, ten days after the rule's deferred effective date, Louisiana's Department of Wildlife and Fisheries (LDWF) sued NMFS[1] under the Administrative Procedure Act, challenging the Final Rule as arbitrary and capricious.[2]

---

[1] Louisiana also sued the National Oceanic and Atmospheric Administration, Department of Commerce, and various administrators and secretaries in their official capacities. For ease of reference we focus, as the parties do, on NMFS as the principal defendant, as it promulgated the Final Rule.

[2] While the State, through LDWF, has vigorously pursued this action, to date, no shrimpers, presumably most directly impacted by the Final Rule, have attempted to intervene in this action.

After denying Louisiana's request for a temporary restraining order, the district court preliminarily enjoined enforcement of the Final Rule in Louisiana inshore waters until February 1, 2022. In its order the court stated, in a footnote, that "'[t]he State of Louisiana ha[d] standing to sue in [its] quasi-sover[e]ign capacity because of its interest in and ownership of its marine resources.'" *Louisiana v. Dep't of Commerce*, 559 F. Supp. 3d 543, 548 n.19 (E.D. La. 2021) (quoting *State of La. ex rel. Guste v. Verity*, 681 F. Supp. 1178, 1181 (E.D. La. 1988), *aff'd*, 850 F.2d 211 (5th Cir. 1988)). The State did not seek an extension when the injunction expired.

Instead, Louisiana moved for summary judgment, focusing on the merits of its claims. NMFS opposed and filed a cross-motion for summary judgment. In its motion, NMFS defended the merits of the Final Rule but further asserted that Louisiana lacked standing to bring this action. In the State's last summary judgment brief (it both supported its motion and opposed NMFS's motion in the same filing), Louisiana devoted a mere two pages to standing.

The State urged that it had standing on four bases. First, citing *Verity*, it asserted that it had standing based on its "interest in and ownership of its marine resources." Louisiana cited no record evidence to support its assertion. Second, the State contended that it "suffer[ed] direct injury from the enforcement resources it will have to expend to comply with the [Final Rule]." Relatedly, Louisiana asserted that the Final Rule "undermine[d] the State's ability to enforce its existing laws by requiring the massive reallocation of resources away from other LDWF activities[, which] . . . places substantial pressure on the State to change its policies and enforcement priorities." For support, Louisiana relied on allegations in its complaint, referenced a declaration from Colonel Chad Hebert, with LDWF's enforcement division, and cited caselaw. Specifically, the State cited Hebert's statement that "[f]ull capacity for LDWF Enforcement staff and field agents is 234, however LDWF Enforcement is currently holding

206 positions due to ongoing funding constraints." Finally, Louisiana asserted that it had *parens patriae* standing "to vindicate the economic interests . . . of the entire State." Again, the State relied on its complaint and caselaw for support.

The district court granted NMFS's motion, holding that Louisiana had not carried its summary judgment burden to establish standing. The court rejected Louisiana's assertion that it had standing in its "quasi-sovereign" capacity because after the court entered the preliminary injunction, Louisiana had "made no attempt to show any injury to its marine resources resulting from the Final Rule." The court acknowledged that it had previously accepted "an interest in and ownership of its marine resources," *see Verity*, 681 F. Supp. at 1181, as a basis for standing at the preliminary injunction stage, but the court held that "at the summary judgment stage, more [was] required," *Louisiana v. Dep't of Commerce*, No. 21-CV-1523, 2022 WL 17251152, at *2 (E.D. La. Nov. 28, 2022) (citing *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561 (1992)). The district court faulted Louisiana for citing "only to the allegations of its [c]omplaint [and] ma[king] no attempt to show any injury to its marine resources resulting from the Final Rule," *id.*, by offering evidentiary support for the State's alleged injury.

The district court also rejected Louisiana's arguments related to increased law enforcement costs and reallocation of resources. The court characterized Hebert's declaration as "insufficiently vague, speculative, and conclusory[.]" *Id.* at *3 (citing *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015)). Analogizing to *Crane*, the court found that, even considering Hebert's statements, "[t]here [was] no evidence of how the Final Rule will burden the LDWF or even any proof that it will not receive federal funding to offset that burden." *Id.* And the district court similarly rejected Louisiana's *parens patriae* argument, faulting the State for relying only on its complaint allegations and failing to "provide any evidence of economic harm to the State's economy caused by the Final Rule." *Id.*

Louisiana timely appealed. We review only whether the district court erred in concluding that Louisiana lacked standing to challenge the Final Rule. It did not.

## II.

On appeal, Louisiana asserts that it has standing because the Final Rule infringes on its sovereign, quasi-sovereign, and proprietary interests. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982). In *Alfred L. Snapp & Son*, the Supreme Court differentiated those three types of interests based on how a State is injured. *Id.* at 600–08. Sovereign interests are "based on [the State's] sovereign character." *Id.* at 601. The Court identified two kinds of sovereign interests: "First, the exercise of sovereign power over individuals and entities within the relevant jurisdiction—this involves the power to create and enforce a legal code, both civil and criminal; second, the demand for recognition from other sovereigns—most frequently this involves the maintenance and recognition of borders." *Id.* States have sovereign interests by virtue of their being co-sovereigns in our Nation's federalism.

Related, but distinct, quasi-sovereign interests "consist of a set of interests that the State has in the well-being of its populace." *Id.* at 602. "First, a State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general. Second, a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system." *Id.* at 607. Only the first is at play here.[3] In either case, a plaintiff-State may sue as *parens patriae*, i.e., in a

---

[3] The second type of quasi-sovereign interest centers on "ensuring that the State and its residents are not excluded from the benefits that are to flow from participation in the federal system." *Id.* at 608. "Federal statutes" create these "benefits" "that a [S]tate will obviously wish to have accrue to its residents." *Id.* Thus, there is a distinction between a State's sovereign interest in enforcing its own law and a State's quasi-sovereign interest in obtaining benefits under federal law on its residents' behalf.

representative capacity, to vindicate an injury to a "sufficiently substantial segment of its population." *Id.* at 607.

Finally, a State may have proprietary interests sufficient to confer standing, much like a private litigant. After all, a State can enter into contracts, own land, and participate in business ventures. *See id.* at 601; *see also Chisholm v. Georgia*, 2 U.S. 419 (1793). "And like other such proprietors it may at times need to pursue those interests in court." *Alfred Snapp & Son*, 458 U.S. at 601–02. These proprietary interests have been extended, e.g., to a State's collection of excise tax revenues, at least as against other States. *See Wyoming v. Oklahoma*, 502 U.S. 437, 447–50 (1992). And we have held that a State suffered injury to a proprietary interest when a change in federal law would have required the State to issue additional driver's licenses at a loss. *Tex. v. United States*, 809 F.3d 134, 155 (5th Cir. 2015), *aff'd by an equally divided court*, 579 U.S. 547 (2016).

We examine the State's proffered interests and concomitant injuries as follows.

## III.

We review summary judgments *de novo*. *Norman v. Apache Corp.*, 19 F.3d 1017, 1021 (5th Cir. 1994). A party is entitled to summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[F]acts that are subject to genuine dispute are viewed in the light most favorable to [the non-moving party]." *Taylor v. Riojas*, 141 S. Ct. 52, 53 n.1 (2020) (per curiam).

We likewise review whether a plaintiff has Article III standing *de novo*. *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015). As plaintiff, Louisiana bears the burden of establishing standing. *Tex. v. United States*, 50 F.4th 498, 513 (5th Cir. 2022). To do so, a plaintiff must "have (1) suffered an injury in fact, (2) that is fairly traceable to the

challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) (quotation marks and citation omitted). Here, the major sticking point is whether Louisiana has presented evidence of an injury-in-fact that satisfies Article III.

Louisiana contends its sovereign interests are injured by the Final Rule's preemption of state laws, interference with Louisiana's enforcement of its own wildlife laws, and interference with the marine resources in the State's territorial waters (as well as with the State's regulation of those resources). Louisiana next argues that its quasi-sovereign interests in the economic well-being of its populace suffer injury because the Final Rule inflicts adverse economic consequences upon its citizens. Lastly, Louisiana asserts that the Final Rule injures the State's proprietary interests because of increased LDWF enforcement costs.

## A.

Casting a bit deeper into Louisiana's asserted sovereign interests, the State urges on appeal that it has standing based on: (1) "the Final Rule's preemption of state laws regulating the harvesting of shrimp in Louisiana waters"; (2) the rule's "interference with Louisiana's enforcement of its own wildlife laws"; (3) the State's "sovereign interest in the shrimp in its waters," *cf. Verity*, 681 F. Supp. at 1181;[4] and, relatedly, (4) Louisiana's interest in regulating those marine resources. The first and last grounds readily escape the net because Louisiana failed to raise these arguments

---

[4] Specifically, the *Verity* district court held that "Louisiana ha[d] standing to sue in the quasi-sover[e]ign capacity because of its interest in and ownership of its marine resources." 681 F. Supp. at 1181. Louisiana adopted that characterization before the district court in this case but rebrands this species of interest as "sovereign" on appeal.

before the district court.  The State's other asserted sovereign interests likewise yield no catch, for the reasons discussed in turn.

### *1. and 4.*

Generally, "arguments not raised before the district court . . . cannot be raised for the first time on appeal," *Webster v. Kijakazi*, 19 F.4th 715, 720 (5th Cir. 2021) (quotation marks and citation omitted), "absent extraordinary circumstances," *Chevron USA, Inc. v. Aker Mar. Inc.*, 689 F.3d 497, 504 (5th Cir. 2012).  However, "[a]n argument is not [forfeited] . . . if the argument on the issue before the district court was sufficient to permit the district court to rule on it." *Webster*, 19 F.4th at 720 (quotation marks and citation omitted).

Louisiana's contentions based on the Final Rule's preemption of state laws and its interference with the State's regulation of marine resources nowhere appear in the State's opposition to NMFS's motion for summary judgment.  Nevertheless, Louisiana asserts that it did not forfeit either basis for standing because the State alleged in its complaint that it "sue[d] to vindicate its sovereign, quasi-sovereign, proprietary, and *parens patriae* interests."  But alleging grounds for standing in a complaint is not the same as asserting—and substantiating—those theories when resisting summary judgment, because the district court cannot "rule on" mere allegations at the summary judgment stage of litigation.  *Webster*, 19 F.4th at 720; *see also Chevron USA, Inc.*, 689 F.3d at 504.  Louisiana therefore failed to preserve these grounds for standing by first adequately urging them in the district court.

Of course, there are exceptions to every rule.  We have limited discretion to reach an issue first raised on appeal when it presents "a purely legal matter and failure to consider the issue will result in a miscarriage of justice."  *Rollins v. Home Depot USA*, 8 F.4th 393, 398 (5th Cir. 2021)

(quotation marks and citation omitted).  Louisiana urges us to exercise our discretion in this instance.  Presuming the State's unpreserved bases for standing involve purely legal questions, we focus on whether extraordinary circumstances warrant doing so.

Louisiana maintains that it "had no reason to press the relevant argument[s] more specifically" at summary judgment because the district court had already determined that the State had standing in granting the preliminary injunction.  The State thus "simply had no reason" to litigate the "standing issue more vigorously and raise[] the argument[s] more specifically."   While on the surface, Louisiana's position resonates somewhat—the district court had previously held the State had standing, after all—we discern no extraordinary circumstance that justifies consideration of the forfeited arguments.

Louisiana had the burden of establishing standing in the district court. *See Lujan*, 504 U.S. at 561.  When NMFS cross-moved for summary judgment, in response to Louisiana's own dispositive motion, it argued that Louisiana lacked standing.  Louisiana was therefore on notice that NMFS was contesting Louisiana's standing—and seeking summary judgment on that basis. *Cf. id.* (The elements of standing are "an indispensable part of the plaintiff's case, [such that] each element must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation.").  In the State's combined opposition to NMFS's motion and reply in support of its own, Louisiana engaged, briefly, on the standing issue. That the State failed to conjure all its grounds for standing for the district court's consideration is not itself an exceptional circumstance.  And Louisiana offers no reason for its omission that rises to such a circumstance. Therefore, we discern no "miscarriage of justice," *Rollins*, 8 F.4th at 398, in declining to consider the Final Rule's purported preemption of state laws or

its interference with the State's regulation of its marine resources in evaluating Louisiana's standing.

### 2. and 3.

We turn now to the merits of Louisiana's preserved arguments: its *Verity*-based assertion that the State's interests in its natural resources are harmed by the Final Rule, and its contention that increased enforcement costs caused by the rule will pressure Louisiana to change its enforcement priorities. In the end, neither of these arguments nets standing for the State.

In *Verity*, the district court held that "the State of Louisiana ha[d] standing to sue in the quasi-sover[e]ign capacity because of its interest in and ownership of its marine resources." *See* 681 F. Supp. at 1181. Because we did not address standing in the appeal of that case, this court's decision "does not stand for the proposition that no [jurisdictional] defect existed." *Lefebure v. D'Aquilla*, 15 F.4th 650, 657 (5th Cir. 2021) (citation omitted). Regardless, assuming *arguendo* that *Verity* articulated a sovereign interest that could support standing, Louisiana's argument fails for lack of evidentiary support.

To resist summary judgment, Louisiana was required to present evidence of a "concrete and particularized invasion of a legally protected interest." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008) (quotation marks and citation omitted). Under *Verity*, Louisiana's relevant interest is its ownership or trustee interest in its marine resources as "property" of the State. It follows that Louisiana must show an injury to those marine resources. But the State does not identify competent summary judgment evidence that substantiates any alleged injury that the Final Rule inflicts on Louisiana's marine resources. On the contrary, under the Final Rule, less shrimp will be extracted from Louisiana waters and fewer turtles will ostensibly be caught inadvertently in shrimpers' nets. Besides, while Louisiana directs us to the Final Rule's EIS, which forecasts the impact on

shrimp harvests Gulf-wide, the State offers no evidence specific to *its own* shrimp harvests, in its own waters, much less an injury to its resources. We therefore agree with the district court that Louisiana "has made no attempt to show any injury to its marine resources resulting from the Final Rule," such that this argument fails.

Louisiana also urges that "the Final Rule interferes with Louisiana's enforcement of its own wildlife and fisheries laws, and in so doing, places pressure on Louisiana to change those laws" thereby causing a separate injury to its sovereign interest. Louisiana tethers this argument to Colonel Hebert's declaration testimony that the Final Rule places "additional strain" on the LDWF's enforcement resources and relies on *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019), to support the notion that the Final Rule "pressures [Louisiana] to abandon its laws and policies."

This argument is necessarily contingent on a finding that the Final Rule will increase LDWF enforcement costs. Setting aside complaint allegations, the sum of Louisiana's proof on that score is drawn from Hebert's declaration. He states that additional enforcement duties triggered by the Final Rule "could substantially burden and interfere with LDWF Enforcement's ability to effectively perform its various other enforcement duties." He also avers that LDWF does not expect to receive "additional or commensurate" funding to defray the "additional LDWF Enforcement efforts." But Hebert's declaration does not explain the "pressure" this might bring to bear on Louisiana's sovereign prerogatives; i.e., the declaration does not "connect the dots" so as to create a genuine issue of material fact as to the State's ostensible sovereign injury. Instead, as further discussed in III.C. below, Hebert's testimony is couched in speculative, general language (the rule "*could*" burden LDWF) that is flatly belied by the Final Rule, which by its terms does not require Louisiana to enforce it, and unrefuted evidence from NMFS that demonstrates that the agencies

12

No. 22-30799

annually coordinate enforcement efforts, including funding to cover federal priorities. *See infra* n.6. Louisiana's lack of competent summary judgment evidence fatally undermines its assertion of standing on this basis.

## B.

Next, we consider Louisiana's *parens patriae* argument, i.e., that the Final Rule injures its quasi-sovereign interests. The State correctly asserts that it has a quasi-sovereign interest in the general economic well-being of its residents. *See Alfred L. Snapp & Son*, 458 U.S. at 607. More specifically, Louisiana asserts that the Final Rule injures that interest because of the "significant adverse economic impact" the Final Rule will have on Louisiana's shrimping industry, a significant component of the State's economy. Still, Louisiana must show that any such injury affects "a sufficiently substantial segment of its population." *Id.* Louisiana falters on this requirement, again for lack of evidence.

In its opposition to NMFS's motion for summary judgment, Louisiana pointed to its complaint to substantiate its assertion that the Final Rule will affect a sufficiently substantial segment of Louisiana residents. But complaint allegations are insufficient at summary judgment because "pleadings are not summary judgment evidence." *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) ("Once a summary judgment motion is made and properly supported, the nonmovant must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial."). Moreover, while the Final Rule's EIS noted that the rule would adversely affect the shrimping industry across the Gulf of Mexico, Louisiana failed to provide evidence particularly substantiating the rule's impact on *its* shrimping industry or, ergo, "a sufficiently substantial segment of its population." *See Alfred L. Snapp & Son*, 458 U.S. at 607.

No. 22-30799

Nor does Louisiana's invocation of the "special solicitude" afforded States in the standing analysis, *see Texas*, 50 F.4th at 514, rescue this argument, or for that matter the State's other arguments. Special solicitude merely changes "the normal standards for redressability and immediacy," *id.* (citation omitted); it is not a standing shortcut when standing is otherwise lacking. In other words, it countenances some uncertainty as to both the efficacy of a judicial remedy and the *timing* of the injury alleged by a State. *See id.* But "special solicitude" does not absolve States from substantiating a cognizable injury, and neither the Supreme Court nor this court has held that it alters the requirements that the injury must be concrete and particularized. *See Massachusetts v. EPA*, 549 U.S. 497, 517–20 (2007); *Texas*, 50 F.4th at 514. The district court did not err in holding that Louisiana failed to support its standing based on a *parens patriae* theory.[5]

---

[5] Additionally, it is dubious that Louisiana may maintain its *parens patriae* suit against the federal government at all. The D.C. Circuit has held that neither the APA nor *Massachusetts v. EPA* invalidates the "so-called *Mellon* bar, [under which] a State lacks standing as *parens patriae* to bring an action against the federal government." *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019) (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923) ("While the state, under some circumstances, may sue as *parens patriae* for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the federal government." (cleaned up)). Indeed, the *Massachusetts v. EPA* Court explained that "there is a critical difference between allowing a State to protect her citizens from the operation of federal statutes (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." 549 U.S. at 520 n.17 (quotation marks omitted). There, Massachusetts did not "dispute that the Clean Air Act *applie*[*d*] to its citizens; it rather [sought] to assert its rights under the Act." *Id.* Here, Louisiana's *parens patriae* argument appears to fall in the first category, and not the second. Regardless, because the parties do not brief the nuanced applicability of the *Mellon* bar with any granularity, and our decision does not turn on it, we decline to address this point further.

## C.

To finish, we consider whether Louisiana's alleged increased enforcement costs impinge on the State's proprietary interests. The State's argument is as follows: LDWF enforces laws relevant to the shrimping industry. Per Hebert, the Final Rule "could result in significant noncompliance from the shrimping industry." And while LDWF "will endeavor to enforce any and all regulations resulting from" the Final Rule, the additional enforcement duties imposed by the Final Rule "could substantially burden and interfere with LDWF Enforcement's ability to effectively perform its various other enforcement duties." Moreover, Hebert averred that LDWF does not expect to receive "additional and commensurate" funding from NMFS "despite the additional LDWF Enforcement efforts imposed by implementation of [the Final Rule]." As a result, the Final Rule "will result in additional strain on LDWF Enforcement resources," injuring Louisiana's proprietary interests.

NMFS counters that Hebert's declaration does not contain sufficient detail to create a genuine issue of material fact as to Louisiana's injury. Additionally, NMFS asserts that the Final Rule, by its terms, does not require Louisiana to enforce it, so any additional enforcement burden would be self-inflicted, especially because Louisiana could ask NMFS for additional funding to offset increased enforcement costs.

Louisiana's rejoinder is that, at summary judgment, the district court was required to consider Hebert's declaration in the light most favorable to the State. And Louisiana asserts that in fact it is required to enforce the Final Rule, citing Louisiana Revised Statute § 56:493. That statute provides that "[t]he exclusive control of the shrimp fishery and the shrimp industry in Louisiana is vested in [LDWF], which shall enforce the laws regulating same."

The district court rejected Louisiana's position, relying on *Crane v. Johnson*. We begin there.

In *Crane*, we considered Mississippi's challenge to the Deferred Action for Childhood Arrivals (DACA) program. 783 F.3d at 247. Mississippi urged that it had standing to challenge DACA as injurious to its proprietary interests. *Id.* at 252. In support, Mississippi relied on a 2006 report that showed that illegal aliens had cost the state over $25 million annually in social benefits. *Id.* Mississippi contended that because DACA allowed a certain class of those illegal aliens to remain in the state, the program caused the state to incur further costs. *Id.* Problematically, the report was from 2006, while the suit was filed in 2012. *Id.*

We affirmed the district court's conclusion that "Mississippi's alleged fiscal injury was purely speculative because there was no concrete evidence that Mississippi's costs had increased or [would] increase as a result of DACA." *Id.* We faulted Mississippi for failing to submit evidence that DACA-eligible immigrants resided in the state or would move to the state. *Id.* Noting that for Article III standing, Mississippi had to show a "concrete and particularized injury that [was] fairly traceable to DACA," we held that "Mississippi was required to demonstrate that the state [would] incur costs because of the DACA program." *Id.* (citation omitted). And we concluded Mississippi's alleged injury was purely speculative because it was "not supported by any facts[.]" *Id.*

While this case is not precisely on all fours with *Crane*, the same result obtains. Hebert's declaration is speculative on the material points, merely describing what "could" happen, and is thus insufficient by itself to forestall summary judgment. And while Hebert asserts that additional federal funding is not expected, so that the Final Rule will cost the State enforcement resources, Louisiana fails to provide sufficient facts, either through Hebert's

testimony or otherwise, to support those assertions. *See Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 545 (5th Cir. 2019) ("Article III demands more than such conclusory assertions."); *see also, e.g.*, *Clark v. Am.'s Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997) ("Unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment.").

By way of illustration, Hebert's assertion that LDWF will incur increased law enforcement costs as a result of the Final Rule is dependent upon LDWF's actually enforcing the Final Rule. Before the district court, Louisiana provided neither evidence nor argument in support of its assertion that it is required to enforce the Final Rule. If Louisiana's enforcement of the rule is discretionary, any increased enforcement costs would be self-inflicted and therefore insufficient to confer standing. *See Zimmerman v. City of Austin, Tex.*, 881 F.3d 378, 389 (5th Cir. 2018) ("[S]tanding cannot be conferred by a self-inflicted injury.").

Louisiana's belated argument on appeal that it is required to enforce the Final Rule under § 56:493, such that any increased enforcement costs would not be self-inflicted, does not change the calculus, for three reasons. First, Louisiana did not raise that argument before the district court, and "[a]rguments not raised in the district court will not be considered [on appeal] absent extraordinary circumstances." *Chevron*, 689 F.3d at 504 (quotation marks and citation omitted). Additionally, NMFS represented during oral argument that it would offset costs incurred by the State in enforcing the Final Rule, and unrebutted record evidence supports that contention.[6] Thus, even if Louisiana is required by state law to enforce the

---

[6] Emanuel Antonaras, the Assistant Director of the Southeast Division of NMFS's law enforcement arm, submitted a declaration describing the Joint Enforcement

No. 22-30799

Final Rule, the record indicates that the State would suffer no cognizable injury because NMFS would provide commensurate funding to LDWF for its additional enforcement efforts. Third, Louisiana cannot manufacture injury with a novel interpretation of a general state statute. There is nothing in the record to suggest that Louisiana has previously interpreted § 56:493 to require the State to enforce federal regulations.[7] Doing so now, in the context of this litigation, gives rise to self-inflicted injury, if it gives rise to injury at all. Louisiana's argument as to its proprietary injury therefore fails.[8]

*    *    *

Based on the record and procedural history of this case, the district court did not err in concluding that Louisiana failed to establish that it has standing to challenge the NMFS's Final Rule. The district court's summary judgment in favor of NMFS dismissing the State's claims is therefore

AFFIRMED.

---

Agreements (JEA) NMFS enters with States. Per Antonaras, LDWF and NMFS negotiate a JEA once a year that delineates coordinated enforcement efforts and provides funding to LDWF for federal enforcement priorities. For example, the 2020 JEA provided $293,538.40 to LDWF for coordinated TED enforcement.

[7] In fact, § 56:493 peacefully coexisted for years with now-repealed Louisiana Revised Statute § 56:57.2, which forbade LDWF from "enforc[ing] any federal law or regulation which requires any commercial or recreational fishermen to use TEDs in Louisiana waters until" several conditions had been satisfied.

[8] Nor is the anti-commandeering doctrine applicable. The doctrine applies when a *federal* law "directly command[s] the executive or legislative branch of a state government to act or refrain from acting without commanding private parties to do the same[.]" *Brackeen v. Haaland*, 994 F.3d 249, 299 (5th Cir. 2021) (en banc). The Final Rule, by its text, does not require Louisiana to "act or refrain from acting," and § 56:493, as a state statute, does not support any anti-commandeering argument.

18